IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | |
|---|---|
| AJUA ALEMANJI, <br> Plaintiff, | * <br> * <br> * <br> * |
| v. | * Civil Action No. 09-cv-00500-AW |
| ALFRED TENGEN, <br> Defendant. | * <br> * <br> * <br> * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## Memorandum Opinion

Plaintiff brought this breach of contract and fraud action against Defendant, asserting that Defendant owed him damages for failure to timely deliver his goods to Cameroon.[1] On February 28, 2012, after Plaintiff had concluded his case in chief before a District of Maryland jury, the Court found that Plaintiff had not produced adequate evidence of material elements of his prima facie case and thus granted Defendant's Motion for a Directed Verdict on both claims pursuant to Federal Rule of Civil Procedure 50(a). The Court will now memorialize its ruling and expound upon the bases of its decision.

I.   FACTUAL & PROCEDURAL BACKGROUND

On February 27, 2009, Plaintiff sued Defendant alleging that Defendant had breached a contract to transport Plaintiff's products from the United States to Cameroon by October 31, 2008, for the express purpose of Plaintiff being able to sell those goods in Cameroon before the Christmas season at substantial profit. Defendant in his pleadings contended that the parties had

---

[1] The Court takes judicial notice of the fact that Cameroon is a country in west Central Africa, bordered by Nigeria and Chad.

merely agreed to share a forty-foot container in order to save shipping costs but contended that their agreement did not extend to guarantees of shipment or delivery by a certain day or within a certain time period.

At the trial before Judge Williams and a seven-member jury, Plaintiff put forward his own testimony as well as the testimony of his wife and of an individual named Francis Gwanmesia, who is Plaintiff's brother-in-law and also a close friend of Defendant. In order to clarify the principal issues underlying the instant action, the following statement of facts is mostly derived from Plaintiff's testimony. The testimony of Plaintiff's wife and brother-in-law will be discussed throughout the Court's analysis as relevant.

Plaintiff testified that in the fall of 2008, he had been seeking to ship a car for his mother as well as certain products for which he had paid around $56,000, from the United States to Cameroon in order to sell them during the Christmas season. First, Plaintiff testified that he had spoken with another shipping company, World Appliance & Shipping, and had received an estimate of $4,475. Plaintiff produced a letter he had written to the company stating the same. Plaintiff testified that he had then spoken with his brother-in-law, Francis Gwanmesia, who had told Plaintiff that he had two friends who had shipped goods to Cameroon before and were planning to do so within the coming months. Gwanmesia provided Plaintiff with Defendant's contact information and the contact information of another individual.

Plaintiff testified that he then contacted Defendant, one of his brother-in-law Gwanmesia's close friends, and Defendant told Plaintiff that Plaintiff could share his forty-foot container. It turned out that Defendant also happened to be shipping a car to Cameroon, and Plaintiff testified that Defendant told Plaintiff that he would build a special crate to protect the cars and allow the parties to fit more goods into the container. According to Plaintiff, Defendant

also said he would procure a forklift-like device to lift the cars into the container. Plaintiff testified that he was unfamiliar with getting goods through Customs in Cameroon and that Defendant had said he would deal with Customs for Plaintiff's goods as well as his own, as long as Plaintiff would handle customs for Plaintiff's car, which was expected to be more costly. According to Plaintiff, Defendant said that Plaintiff's portion of the shipping costs would be only $3,450. Plaintiff testified that he was happy to have found a way to ship the goods for a good deal less than he would have had to pay the shipping company, as well as the fact that he was doing business with a family friend and that he was getting benefits like Defendant's creation of the crate and use of the forklift.

According to Plaintiff's testimony, the parties engaged in several informal discussions over the phone. Plaintiff testified that he was never under the impression that Defendant shipped goods for a living but that he trusted Defendant's statements because Defendant was a friend of the family and he knew that Defendant had shipped goods to Cameroon before. Plaintiff testified that in one such phone conversation, the parties got to talking about how they both owned their own businesses. Plaintiff testified that he mentioned to Defendant that some of the goods he was shipping to Cameroon were items related to his business that he was planning to sell during the Christmas season. He said that Defendant told him the goods would be there by December.[2] Plaintiff also believed the goods would arrive by December since he was aware that travel time for goods from the United States to Cameroon is generally six-to-eight weeks.

Plaintiff testified that on or around September 8, 2008, he dropped the goods off with Defendant and gave Defendant a check for $3,450. Plaintiff testified that later, he got nervous about the fact that he had left so many goods and a car with Defendant without having any written evidence that Defendant had received the goods. Plaintiff testified that he went to

---

[2] At another point, Plaintiff testified that Defendant told him the goods would arrive by the end of October.

Defendant's place of business and wrote up an informal receipt reflecting that Defendant was in receipt of Plaintiff's 19 boxes of products for sale as well as a Toyota Camry. From the parties' pleadings, it appears that both agree that a receipt was created at Defendant's place of business. At the inception of trial, both parties also appeared to agree that the receipt was not meant to constitute a contract between the parties, that neither party signed the document,[3] and that the document lists only some elements of the parties' agreement but leaves out material elements, such as the fact that Defendant made a crate for the cars and procured a forklift or similar device to get Plaintiff's car on the crate.

Before trial, Defendant objected to the entry into evidence of a photocopy of the parties' receipt, listed as Exhibit 1. The receipt contains five lines as follows: (1) 19 boxes with products for sale of items in Cameroon; (2) 2002 Toyota Camry (Champagne color); (3) Received by [Defendant writes/signs name]; (4) items will be delivered on/before 10/31/2008; and (5) items are for sale in Cameroon around 12/2008. *See* Doc. No. 36 Ex. A. The Court expressed strong reservations about allowing a photocopy of this receipt into evidence, as the original could not be located and there were legitimate concerns as to its authenticity, particularly regarding the last two lines, which Defendant suggested were added by Plaintiff after Defendant wrote his name on the third line.[4] Accordingly, the Court reserved judgment on the admissibility of Exhibit 1 and the jury was not shown Exhibit 1 during presentation of Plaintiff's case.

Ultimately, Plaintiff's goods did not arrive in Cameroon until early December. Although still in time for the Christmas season, this was much later than the six-to-eight weeks Plaintiff

---

[3] Although it appears at first glance that Defendant signed his name in the middle of the document, the Court understands both parties to have agreed that Defendant merely wrote his name on the document without the requisite intent that his written name constitute his signature.

[4] Plaintiff contends that the last two lines were instead written while the parties were talking and before Defendant wrote his name on the middle line. The Court notes that this dispute did not affect the grounds on which the Court granted a directed verdict.

had anticipated when he dropped the goods off with Defendant on September 8. Additionally, Plaintiff testified that Defendant had been largely unresponsive to Plaintiff ever since Plaintiff had dropped off the goods with Defendant, to the extent that Plaintiff did not discover that the goods were in Cameroon until January. At this point, Plaintiff testified that he had already traveled to and returned from Cameroon with his wife and child; that he had visited family in Cameroon but that his primary purpose of the trip, to sell his goods, had been thwarted.

According to Plaintiff, Defendant traveled to Cameroon in January and received Plaintiff's goods from Customs, where the Customs costs of Plaintiff's car was more than Defendant had initially estimated to Plaintiff. Plaintiff testified that Defendant paid the fee but demanded that Plaintiff's father, who lives in Cameroon and was receiving the goods on behalf of Plaintiff, reimburse Defendant for the fees before Defendant would turn over the products. Upon paying Defendant the customs fees, Plaintiff was finally in constructive receipt of his goods. However, it being February by this time, Plaintiff had missed the Christmas shopping season and was unable to sell all his goods at a substantial profit as he had planned.

After Plaintiff's more than three hours of testimony, the Court determined that Plaintiff did not establish that the parties had entered into either a written contract or an oral contract with terms of sufficient certainty and definiteness to be decipherable by a jury. Rather, the central focus of Plaintiff's testimony was on damages. It is worth noting that the Court did not grant a directed verdict on the issue of damages, finding this to present a credibility issue best left to the jury.[5]

---

[5] However, the Court notes in hindsight serious concerns about the authenticity of several exhibits presented at trial. For example, Plaintiff presented several largely (or entirely in some cases) self-prepared, handwritten receipts for products allegedly purchased totaling around $56,000, as well as replacement products purchased totaling around $17,000. Plaintiff stated that a store manager had written his name on several of the receipts to sign off on them, but as to at least one, the handwriting of the store manager's name was unquestionably the same as the handwriting on the rest of the receipt. The items were purchased entirely with cash and debit card, and Plaintiff claimed he alone funded the purchases even though the amounts totaled more than Plaintiff had earned the prior

II.   **STANDARD OF REVIEW**

The Court may grant a motion for directed verdict pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. To avoid a directed verdict, a plaintiff must present sufficient evidence to establish a prima facie case. *Gairola v. Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985). The test is "essentially whether, without weighing the evidence or considering the credibility of the witnesses, 'there can be but one conclusion as to the verdict that reasonable jurors could have reached.'" *Id.* (quoting *Wheatley v. Gladden*, 660 F.2d 1024, 1027 (4th Cir. 1981).

"Where there is substantial evidence in support of plaintiff's case, the judge may not direct a verdict against him, even though he may not believe his evidence or may think that the weight of the evidence is on the other side …[.]" *Id.* at 298, *quoting Garrison v. United States*, 62 F.2d 41, 42 (4th Cir.1932). A mere scintilla of evidence, however, is insufficient to defeat a directed verdict. *Doucet v. Diamond M. Drilling Co.*, 683 F.2d 886 (5th Cir.1982).

III.   **ANALYSIS**

---

year. Although Plaintiff produced bank statements showing that the funds for these purchases had left his account, the bank statements produced were entirely redacted except for a single line stating the withdrawal amount, vendor, and date.

    Particularly, the Court has reservations as to whether Plaintiff's self-made receipts, which are hearsay, are even admissible under the business records exception. Federal Rule of Evidence 803(6) provides a hearsay exception for records of a regularly conducted activity, as long as: (1) the record was made at or near the time by— or transmitted by—someone with knowledge; (2) the record was kept in the course of a regularly conducted activity of a business; (3) making the record was a regular practice of that activity; (4) all these conditions are shown by the testimony of the custodian or another qualified witness; and (5) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness. F.R.E. 803(6). Here, the store receipt proffered by Plaintiff was self-prepared. Although Plaintiff worked part-time at the business, he was not serving as an employee at the time of his alleged purchases. The receipts handwritten by Plaintiff record the purchase of thousands of dollars worth of instruments, much of it paid for with cash. It is doubtful to the Court that these self-prepared receipts represent routine transactions made in the regular course of the store's business, and the Court expresses further doubt that both the source of the information (Plaintiff), and the method or circumstances of preparation constitute sufficient indicia of trustworthiness.

A.     Plaintiff's Breach of Contract Claim

To prevail on a claim for breach of contract in Maryland, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation. *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (2001). It is not necessary that the plaintiff prove damages resulting from the breach, as one may recover nominal damages even though he has failed to prove actual damages. *Id.* It is well settled in Maryland that:

> no action will lie upon a contract, whether written or verbal, where such a contract is vague or uncertain in its essential terms. The parties must express themselves in such terms that it can be ascertained to a reasonable degree of certainty what they mean. If the agreement be so vague and indefinite that it is not possible to collect from it the intention of the parties, it is void because neither the court nor jury could make a contract for the parties. Such a contract cannot be enforced in equity nor sued upon in law. For a contract to be legally enforceable, its language must not only be sufficiently definite to clearly inform the parties to it of what they may be called upon by its terms to do, but also must be sufficiently clear and definite in order that the courts, which may be required to enforce it, may be able to know the purpose and intention of the parties.

*Hoffmann v. Cnty. Title Co.*, 213 A.2d 563, 565 (1965) (affirming trial court's grant of directed verdict on breach of oral contract claim where parties' statements were too vague and conjectural to present a jury question) (citations omitted).

Where a party alleges an oral contract, Maryland courts require that it be sufficiently definite regarding the nature and extent of duties undertaken that the trier of fact could determine what agreement was reached. *See Mogavero v. Silverstein*, 790 A.2d 43, 50 (2002) (affirming trial court's dismissal of breach of contract claim where the alleged oral agreement was too vague and indefinite to be enforceable).

In presenting his case in chief, Plaintiff was unable to establish any oral or written contract between the parties. Plaintiff presented his own testimony, as well the testimony of his

wife and the brief testimony of a neutral party, Plaintiff's brother-in-law Francis Gwanmesia, who is also a close friend of Defendant and put the two parties in contact with each other.

First, Plaintiff did not establish an oral contract whose essential terms were certain or definite. The testimony of Plaintiff's wife did little to establish a contract, as the greater part of her statements were based on her understandings of what had conspired between the parties, which were clearly hearsay. Plaintiff's own testimony conveyed that the parties' agreement was derived from a series of statements made in the midst of several informal conversations over the phone between the parties, who are family friends and who both sought to ship items to Cameroon. Plaintiff testified that in one such conversation, the parties were talking about how they both owned their own businesses, at which time Plaintiff mentioned that he would be shipping goods to Cameroon for sale during the Christmas season. Defendant responded that the goods would be there by December. There was no mention of several material issues, including the cost of Plaintiff's goods or the magnitude of potential lost profits should the goods not arrive by December. Moreover, Plaintiff never inquired into Defendant's arrangement with the vessel shipping the goods or suggested that he would pay Defendant a certain sum over and above the $3,450 to ensure the goods' timely arrival.[6]

---

[6] Moreover, Plaintiff's testimony and evidence presented regarding his communication to another shipping company did nothing to establish the existence of a contract between Plaintiff and Defendant. Plaintiff testified that he had spoken to an agent of World Appliance & Shipping before getting in touch with Defendant, and that Plaintiff had reached a tentative deal with that company to ship his goods for $4,475. In support of his testimony, Plaintiff produced a letter he claims he wrote and sent to the shipping company on August 26, 2008, stating, *inter alia*, "the goal is to get this shipped out as soon/fast as possible to get it to Cameroon on or before December 2008." *See* Pl.'s Ex. 8. Plaintiff does not explain why he wrote the shipping company a letter and provides no evidence that the shipping company sent him any communication in return (or at all, for that matter). Plaintiff does not mention in this letter that he plans to ship any goods for sale; rather, he refers only to his car as an item for shipment. This is especially strange given that, by Plaintiff's own admission, he took photos of his goods on August 24, 2008, two days before writing the letter.
Additionally, Plaintiff presented a copy of a check for $500 that he had allegedly sent the shipping company as a deposit or down-payment for the $4,475. *See* Pl.'s Ex. 8. In the "memo" line of the check, Plaintiff simply wrote "shipping goods"; there is again nothing to suggest that his agreement with the shipping company involved more than the shipping of his car.

Furthermore, the jury heard brief testimony from Francis Gwanmesia which strongly suggested that Defendant had never known Plaintiff planned to ship around $56,000 worth of sellable goods in Defendant's container. Although Gwanmesia was called as a witness by Plaintiff, the Court understood Gwanmesia, who is both Plaintiff's brother-in-law and a close friend of Defendant, to be a neutral party. Gwanmesia testified that he had paid Plaintiff $500 to ship some goods on Plaintiff's side of the container. He testified that Defendant had never mentioned, at least to him, that the goods could be expected to arrive in Cameroon by a certain date.

Gwanmesia further testified that, on or around September 8, he had spent some time at Plaintiff's house prior to Plaintiff driving over to meet Defendant and drop off their respective items for placement in the container. Guanmesia noted that, when he arrived at Plaintiff's house, he saw a lot of boxes and some of them may not have been sealed yet. However, according to Gwanmesia, the boxes were sealed prior to being transported to the location where they were left with Defendant. Given Guanmesia's testimony, it seems highly unlikely that Defendant directly observed Plaintiff's goods. Moreover, even if Defendant had somehow seen a portion of Plaintiff's goods (which consisted of musical equipment such as keyboards, microphones, and the like), he had no reason to suspect that they were collectively worth $56,000 or that Plaintiff was expecting to sell them at twice their cost.

---

Thus, putting aside the credibility issues raised by this evidence, which the Court reserves for the jury, the letter and check raise no inference that Plaintiff was communicating to either Defendant or to any other entity that he was shipping expensive goods that would greatly diminish in value if not sold in December.

Moreover, Plaintiff indicates in his letter to the shipping company that Plaintiff regards $4,475 as a "good price" for the shipment of his goods. A reasonable inference can be drawn, then, that Plaintiff was aware of what was commercially reasonable in regard to shipping goods and would not have interpreted his loose exchanges with Defendant, a family friend, and Defendant's substantially lower price of $3,450, on top of what seem to be several added favors by Defendant (such as building the crate), as creating a binding contract in which Defendant would guarantee the vessel's arrival.

Yet as a result of these few isolated exchanges, Plaintiff contends that Defendant implicitly agreed to guarantee timely shipment and delivery and assume the risk of lost profits of around $80,000 should Plaintiff's goods not arrive in Cameroon by the Christmas season. The legal rights and obligations that came into being by virtue of the parties' statements in this instance "can be only conjectural in the setting and context in which [they were] made." *See Hoffman*, 213 A.2d at 565. Given the vague statements about Plaintiff's goods and the informal context in which they were spoken, a finder of fact could not reasonably determine, even as an initial matter, what duties and obligations the parties might have intended or understood themselves to be liable for.

Moreover, to the extent Plaintiff claims that Defendant knowingly and intentionally guaranteed the vessel's timely arrival, the court finds that no reasonable jury would have found that Defendant voluntarily agreed to such an arrangement. "A contract should not be construed to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties. *Ramlall v. MobilePro Corp*, 30 A.3d 1003, 1016 (2011) (*citing Middlebrook Tech, LLC v. Moore*, 849 A.2d 63 (2004)). Here, Plaintiff knew that, for $3,450 and for about $1,000 less than he had been willing to pay a shipping company, Defendant, a trusted family friend, would share a substantially larger container with Plaintiff and would additionally load Plaintiff's car, create a special crate for the vehicle, and make sure that Plaintiff's goods cleared Customs in Cameroon. Plaintiff knew that Defendant was not in the business of shipping goods and that Defendant had no control over the vessel which physically shipped both of their goods to Cameroon. Given the facts offered by Plaintiff's own testimony, it would border on the absurd to find that the parties had reached a bargained-for agreement that, for some portion of the $3,450, Defendant assumed control over that which both parties knew he had no control and

legally obligated himself to act as a kind of insurer, assuming the risk of lost profits in the event Plaintiff's goods did not reach Cameroon by the Christmas season.

Additionally, had Plaintiff truly believed that Defendant's statement that the goods would arrive by December constituted an enforceable promise supported by Plaintiff's consideration of some portion of the $3,450, Plaintiff's reasonable reaction would have been to protect the benefit of this bargain by inquiring into the means of such timely delivery, such as the nature of any deal Defendant might have made with the vessel. Rather, Plaintiff's own testimony reveals that any assertions Defendant may have made relating to the arrival of goods were "not communicated in such a way that the addressee of the expression could justly expect performance and reasonably rely thereon." *Goldstein v. Miles*, 859 A.2d 313, 329 (2004) (upholding district court decision finding no oral contract where expressions by the parties were so vague and indefinite that it was not possible to decipher the intention of the parties) (citation omitted).

Nor did Plaintiff present any evidence of a written contract. Although the parties created a receipt of their agreement, both parties contend that the receipt is not a contract, that it does not contain the signatures of the parties, and that it does not contain several material terms on which the parties agreed. As discussed above, the Court did not admit a duplicate of this "receipt" during trial, pursuant to Federal Rule of Evidence 1003, due to substantial concerns as to its authenticity and the fact that the original could not be located. Even if the receipt had been admitted into evidence, including the lines below what appears to be Defendant's signature[7] in which Plaintiff wrote that: (1) the shipment would reach Cameroon by October 31, 2008 and (2) the items were for sale December 2008, the Court finds this evidence insufficient as a matter of law to generate a finding that Defendant legally obligated himself to the timely arrival of goods,

---

[7] As noted above, although it appears at first glance that Defendant signed his name in the middle of the document, the Court understands both parties to have agreed that Defendant merely wrote his name on the document without the requisite intent that his written name constitute his signature.

an element over which he had little or no control. Even if the Court had admitted the receipt into evidence before the jury, the receipt would merely have served as evidence of the parties' intent to enter into an oral contract. But as discussed above, given the context of the parties' statements, the extemporaneous and offhanded nature with which Plaintiff drafted the receipt,[8] the relationship of the parties as family friends, creating the specter that any "agreement" between them may have been little more than a favor by Defendant, and Defendant's lack of sophistication in matters of shipping, the Court finds that no reasonable jury could conclude that Defendant intended to legally obligate himself to the timely shipment and delivery of Plaintiff's goods in Cameroon.

Moreover, at no point during Plaintiff's testimony, to the recollection of the Court, did Plaintiff or his counsel state that the parties had at a certain point executed or otherwise made a contract, either written or oral. Rather, Plaintiff and his counsel frequently referred to the parties' "agreement" or "understanding." An understanding or agreement is not necessarily an enforceable contract. *See Rest. (Second) of Contracts* § 3 (1981). While a contract is defined as a "promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty", 1 Samuel Williston, *A Treatise on the Law of Contracts* § 1.1, at 2-3 (Richard A. Lord ed., 4th ed. 1990) (internal citation omitted), an agreement is "a manifestation of mutual asset on the part of two or more persons." *Rest. (Second) of Contracts* § 3. *See also Goldstein*, 859 A.2d at 327. An agreement has "a wider meaning than contract, bargain or promise" and "contains no implication that legal consequences are or are not produced." *Rest. (Second) of Contracts* § 3 cmt. a; *Goldstein*, 859 A.2d at 327.

---

[8] Plaintiff testified that he went over to Defendant's place of business in order to get a written acknowledgement by Defendant that Defendant was in receipt of Plaintiff's goods; as such, Plaintiff admits that the receipt is missing several material terms of the parties' broader agreement. The receipt is handwritten by Plaintiff, and, as discussed above, although Defendant appears to have signed the middle line, the Court understands both parties to be in agreement that Defendant merely wrote his name and did not have the requisite intent to sign the document.

Given the broad and inclusive nature of an "agreement," the Court has little doubt that the parties reached some sort of "agreement" or "understanding" on issues relating to the sharing of the shipping container. After all, Plaintiff made payment to Defendant and Defendant created a crate, allowed Plaintiff to share his container space, procured the means to lift Plaintiff's car into the container, and received Plaintiff's goods in Customs. However, Plaintiff has demonstrated no evidence which would suggest a legally enforceable obligation on behalf of Defendant to timely ship and deliver the goods, which is the entire basis of Plaintiff's breach of contract suit. Plaintiff did not show that Defendant had any conceivable control over the timely shipment and delivery of the goods or that any of the $3,450 provided by Plaintiff constituted consideration for Defendant's promise to get the goods to Cameroon on Plaintiff's timetable. In the absence of such control, and given the knowledge of Plaintiff that Defendant was not a shipper or one who could otherwise control the vessel, any statements made by Defendant which tended to suggest that the goods would arrive at a certain date, given the informal context in which such statements were made, are insufficient as a matter of law to create a legal obligation or liability on behalf of Defendant. Accordingly, the Court granted a directed verdict on Plaintiff's breach of contract claim.

B.   Plaintiff's Fraud Claim

Additionally, Plaintiff brought a claim of fraud against Defendant based on Defendant's statements that Plaintiff's goods would arrive by late October or December. To recover damages for fraud, a plaintiff must prove by clear and convincing evidence that: (1) the defendant made a false misrepresentation of material fact to the plaintiff; (2) the defendant knew of its falsity or made it with reckless indifference to the truth; (3) the misrepresentation was made for purpose of

defrauding the plaintiff; (4) the plaintiff relied on the representation of the defendant and had a right to rely on it; and (5) the plaintiff suffered damages as a result of the misrepresentation. *Adams v. NVR Homes, Inc.*, 135 F. Supp 2d 675, 690 (D. Md. 2001).

Plaintiff did not produce a scintilla of evidence during trial that would support a finding that Defendant intended to defraud Plaintiff. Plaintiff presented no evidence suggesting that any statement made by Defendant regarding the ship's arrival was anything but an honestly mistaken conjecture based on Defendant's prior experiences shipping goods to Cameroon. Plaintiff's wife testified that it was common knowledge that goods usually arrive in Cameroon six-to-eight weeks after delivery to the United States port. In this context, Defendant's statements to Plaintiff were little more than general surmisings based on information known by both parties. Plaintiff knew or should have known that Defendant had little, if any, control over the ship's arrival. As such, and given the overall context in which Defendant's statements were made, it would have been unreasonable for Plaintiff to rely on any representation by Defendant relating to the ship's arrival. No reasonable jury could have found that Plaintiff proved his fraud claim by clear and convincing evidence, and accordingly, the Court granted a directed verdict on Plaintiff's claim of fraud.

IV.   **CONCLUSION**

For the foregoing reasons, as well as any reasons stated by the Court on the record during trial that were not repeated here, the Court grants Defendant's Motion for a Directed Verdict. A

separate Order will follow.

March 1, 2012
Date

                    /s/
Alexander Williams, Jr.
United States District Judge